**Domingo Antonio de los SANTOS,
Plaintiff,**

v.

**IMMIGRATION AND NATURALIZA-
TION SERVICE, Defendant.**

No. 78 Civ. 6005 (RJW).

United States District Court,
S. D. New York.

Oct. 28, 1981.

Antonio C. Martinez, New York City, for plaintiff; Peter Hirsch, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for defendant; Thomas H. Belote, Sp. Asst. U. S. Atty., New York City, of counsel.

ROBERT J. WARD, District Judge.

This action seeks review of an administrative determination made by defendant, the Immigration and Naturalization Service ("the INS"). The case involves a petition to obtain a preferential immigration classification filed by plaintiff Domingo Antonio de los Santos on behalf of one Enmanuel de los Santos. Plaintiff contends that the INS erroneously denied this petition because it incorrectly concluded that Enmanuel de los Santos has not been "legitimated" within the meaning of the Immigration and Nationality Act ("the INA"), 8 U.S.C. §§ 1101–1503. In his complaint herein, plaintiff seeks a declaratory judgment that Enmanuel de los Santos has indeed been "legitimat-

ed" within the meaning of the INA, and asks the Court to remand this action to the INS with directions to grant plaintiff's petition. Plaintiff now moves for summary judgment pursuant to Rule 56(a), Fed.R. Civ.P. Defendant cross-moves for summary judgment pursuant to Rule 56(b), Fed.R. Civ.P. For the reasons hereinafter stated, plaintiff's motion is denied, defendant's cross-motion is granted, and the Court grants summary judgment in favor of defendant.

## BACKGROUND

The facts necessary to decide the motions presently before the Court are undisputed. Plaintiff is a native and citizen of the Dominican Republic. He entered the United States on April 22, 1969, and is presently lawfully admitted for permanent residence in the United States. Enmanuel de los Santos was born in the Dominican Republic, where he presently resides, on October 3, 1957. Plaintiff and Enmanuel de los Santos' mother have never been married. However, eight days after Enmanuel de los Santos' birth, plaintiff acknowledged the infant as his natural son in a certificate filed with the Civil Registry of the Municipality of Salcedo, a city located in the Dominican Republic. Enmanuel de los Santos presently desires to immigrate into the

United States, to which end plaintiff has sought an immigration visa from the INS on his behalf. On September 30, 1977, plaintiff filed a petition with the INS seeking to have Enmanuel de los Santos granted a preferential immigration classification. In a decision dated July 14, 1978, the INS denied plaintiff's petition. Plaintiff appealed this decision to the Department of Justice's Board of Immigration Appeals. The Board of Immigration Appeals, in a memorandum dated November 14, 1978, dismissed the appeal as frivolous. This action, and the motion and cross-motion that are the subject of today's decision, followed.

## DISCUSSION

As noted, Enmanuel de los Santos seeks admission to the United States as an "immigrant," that is, as a permanent resident of the United States. The INA imposes certain numerical limitations on the number of immigrants that may be admitted to the United States in any particular year, and hence on the number of immigration visas that the INS may issue. Unless an applicant for an immigration visa can establish that he or she is exempt from the numerical limitations either as a "special immigrant"[1] or as an "immediate relative" of a United States citizen,[2] the applicant is subject to

1. The term "special immigrant" refers to an alien falling within one of a group of immigration classifications. These classifications include certain (1) returning lawful permanent residents of the United States; (2) former citizens of the United States; (3) ministers of religion; (4) current and former United States Government employees; and (5) former employees of the Panama Canal Company, the Canal Zone Government, or the United States Government in the Canal Zone. 8 U.S.C. § 1101(a)(27). Special immigrants are not subject to the numerical restrictions imposed by the INA. *Id.* § 1151(a).

2. "Immediate relatives" of United States citizens include (1) spouses of United States citizens; (2) certain children of United States citizens; and (3) certain parents of United States citizens. 8 U.S.C. § 1151(b). Such "immediate relatives" are not subject to the numerical restrictions imposed by the INA. *Id.* § 1151(a). The United States immigration and nationality laws classify children of United States citizens in three ways: (1) Certain children of United

States citizens are citizens of the United States at birth. *Id.* § 1401. (2) Children of United States citizens who are not citizens of the United States at birth, but who are unmarried and under the age of twenty-one, are "immediate relatives" of United States citizens and hence are not subject to the INA's numerical restrictions. *See id.* § 1101(b)(1) (defining "child" as an unmarried person under the age of twenty-one); *id.* § 1151(b) (according non-quota immigrant status to "children" of United States citizens). (3) Children of United States citizens who are not citizens of the United States at birth, and who are either married or over twenty-one, are subject to the INA's quota system, but are eligible for priority, under the preference system discussed in text *infra*, in the allocation of the allowable number of immigration visas. *See id.* § 1153(a)(1) (granting preference to "unmarried sons and daughters" of United States citizens); *id.* § 1153(a)(4) (granting preference to "married sons or married daughters" of United States citizens).
It is important to note the statute's use of the term "sons or daughters," rather than the term

these numerical limitations. Presently, the INA provides that no more than 270,000 immigrants may be admitted during any given fiscal year, 8 U.S.C. § 1151(a), and that no more than 20,000 of the immigrants admitted during a particular fiscal year may be from a single foreign state. 8 U.S.C. § 1152(a). Here, it is conceded that Enmanuel de los Santos does not qualify either as a "special immigrant" or as an "immediate relative" of a United States citizen within the meaning of the INA, meaning that he is subject to the INA's numerical limitations.

The INA contains a rather complicated system for determining, in the event the number of eligible applicants exceeds the numerical limitations, which applicants shall be issued immigration visas. Generally, the applicants fall within two categories: those who qualify for one of six "immigration preferences," and those who do not. An applicant is presumed to fall in the nonpreference group unless the applicant demonstrates that he or she qualifies for one of the six preferences. 8 U.S.C. § 1153(d). Nonpreference applicants are admitted, to the extent the annual limitation of 270,000 immigrants has not been exhausted by admissions from the six preference categories, in the order in which they qualify for immigrant status. 8 U.S.C. 1153(a)(7). Nonpreference visas have been unavailable since mid-1978 due to demand in the preference categories, and projections are that they will remain unavailable indefinitely. National Lawyers Guild, Immigration Law and Defense § 4.6(h) (1979). Realistically, then, an eligible alien can hope to gain an immigration visa only if the alien can make the requisite showing to the

INS that he or she qualifies for a preferential immigration classification.

The petition filed with the INS on behalf of Enmanuel de los Santos contends that he qualifies for the second of the six preference categories. This preference authorizes the INS to issue 70,200 immigration visas each fiscal year to "qualified immigrants who are the spouses, unmarried sons or unmarried daughters of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1153(a)(2). The petition filed on behalf of Enmanuel de los Santos argues that he is the unmarried son of Domingo Antonio de los Santos, the plaintiff herein; since plaintiff is an alien lawfully admitted for permanent residence in the United States, the petition concludes that Enmanuel de los Santos is qualified for the second preference category.

The legal principles that govern the determination of this petition are, for the most part, not disputed. The issue is whether Enmanuel de los Santos is the "son" of Domingo Antonio de los Santos within the meaning of 8 U.S.C. § 1153(a)(2). Enmanuel de los Santos can only be the "son" of Domingo Antonio de los Santos if he is Domingo Antonio de los Santos' "child," as that term is defined by section 101(b)(1) of the INA, 8 U.S.C. § 1101(b)(1). Lau v. Kiley, 563 F.2d 543, 545 (2d Cir. 1977); Reyes v. INS, 478 F.Supp. 63, 64 (E.D.N.Y.1979).[3] Since Enmanuel de los Santos is concededly illegitimate, and seeks qualification for the second preference category on the basis of his relationship with his father, the question whether he is a "child" within the meaning of the INA is governed by section 101(b)(1)(C) of the INA, 8 U.S.C.

"children," to describe persons falling in the third category described above. The use of the term "sons or daughters" in this context is designed to avoid the statutory definition of the term "child," since any person qualifying as a "child" of a United States citizen is entitled at least to non-quota immigrant status. 1 C. Gordon & H. Rosenfeld, Immigration Law and Procedure § 2.27b, at 2–194 (1981); see 8 U.S.C. § 1151(a). However, since the INA does not define the term "son or daughter," the INS and the courts have determined whether a person is a "son or daughter" of a United States citizen

by applying the statutory definition of the term child with the exception of its provisions as to age and marital status. 1 Gordon & Rosenfeld, supra, § 2.27c, at 2–196; see text infra.

**3.** For the reasons discussed in note 2 supra, the courts and the INS, in applying the statutory definition of the term "child" to determine whether a person is a "son or daughter" within the meaning of 8 U.S.C. § 1153, disregard the definition's provisions as to age and marital status.

§ 1101(b)(1)(C) ("Section 101(b)(1)(C)"). Section 101(b)(1)(C) provides that the term "child" means an unmarried person under twenty-one years of age who has been

legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation.

8 U.S.C. § 1101(b)(1)(C). Section 101(b)(1)(C) thus sets forth a two-part test for determining when an illegitimate child seeking priority through his or her father will be eligible for a preferential immigration classification: (1) the child must have been "legitimated" under the law of either the child's or the father's residence or domicile; and (2) the "legitimation" must have occurred (a) before the child reached the age of eighteen and (b) at a time when the child was in the legal custody of the legitimating parent or parents.

Under the INS's interpretation of Section 101(b)(1)(C), an illegitimate child has been "legitimated" within the meaning of Section 101(b)(1)(C) only if that child has the attributes of a legitimate child in all respects. Application of this interpretation to the case of Enmanuel de los Santos required the INS to analyze the law of the Dominican Republic, the domicile of Enmanuel de los Santos, in order to determine whether, as a matter of Dominican Republic law, he enjoys the same rights as he would had he been born a legitimate child. The INS concluded the Enmanuel de los Santos, being a child who has been acknowledged by his father but whose parents have not subsequently married, does not have the full rights of a legitimate child under Dominican Republic law. The only difference is that, if Domingo Antonio de los Santos at

some point fathers a *legitimate* child, and then dies intestate, Enmanuel de los Santos will receive only fifty percent of the share of the estate that he would have received had he been born a legitimate child. As a result of this difference, the INS concluded that plaintiff's acknowledgment of Enmanuel de los Santos did not confer upon him the attributes of a legitimate child in all respects, and therefore held that Enmanuel de los Santos has not been "legitimated," and thus is not a "child," within the meaning of Section 101(b)(1)(C). On this basis alone, the INS determined that Enmanuel de los Santos is not entitled to the preferential immigration classification set forth by 8 U.S.C. § 1153(a)(2), and denied plaintiff's petition. The INS accordingly had no occasion to consider whether the "legal custody" prong of the two-part Section 101(b)(1)(C) test has been satisfied in regard to Enmanuel de los Santos.[4]

Plaintiff, in this action, challenges the INS's denial of his petition on two grounds. First, plaintiff contends that the INS, by holding that an illegitimate child must possess legal rights that are coextensive with those of a legitimate child in order to qualify for the second preference category set forth in the INA, incorrectly interpreted the term "legitimated" as used in Section 101(b)(1)(C). Second, plaintiff argues that, if the INS did correctly interpret Section 101(b)(1)(C), the statute violates the United States Constitution because of the distinction that it draws between fathers and mothers of illegitimate children. The principles that govern this Court's review of the INS's decision are familiar. The decision to grant or deny a petition to obtain a preferential immigration classification is one that is within the discretion of the INS and that will be reversed by the courts only upon a showing of an abuse of discretion. *Santana-Figueroa v. INS*, 644 F.2d 1354, 1355 (9th Cir. 1981); *Nazareno v. Attorney*

---

**4.** Under Section 101(b)(1)(C), the requisite "legitimation" can occur under either the law of the child's residence or domicile or the law of the father's residence or domicile. Here, the INS held, on the authority of *In re Reyes*, 16 I. & N. Dec. 475, 479 (1978), *remanded on other*

grounds sub nom. *Reyes v. INS*, 478 F.Supp. 63 (S.D.N.Y.1979), that plaintiff had failed to show that Enmanuel de los Santos had been "legitimated" under the law of New York, plaintiff's residence and domicile. Plaintiff does not contest this ruling in this action.

*General of the United States*, 512 F.2d 936, 939–40 (D.C.Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 53, 46 L.Ed.2d 49 (1975); *Mohamed v. Vician*, 490 F.Supp. 954, 957 (S.D.N.Y. 1980). In applying this abuse of discretion standard, the courts have held that the INS's findings of fact are conclusive if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Bastidas v. INS*, 609 F.2d 101, 104 (3d Cir. 1979); *see Wong Wing Hang v. INS*, 360 F.2d 715, 717 (2d Cir. 1966). At the same time, the courts may engage in plenary review of questions of law, including questions of statutory construction and interpretation. *Tovar v. INS*, 612 F.2d 794, 797 (3d Cir. 1980). Having these principles in mind, the Court turns to plaintiff's two arguments that the INS erroneously denied his petition that Enmanuel de los Santos be granted a preferential immigration classification.

### Plaintiff's Statutory Argument

 The statutory question posed by plaintiff is simply whether, as the INS contends, an illegitimate child has been "legitimated" within the meaning of Section 101(b)(1)(C) only if the child has, by operation of the law of either the child's or the father's domicile, received filial rights that are coextensive with those enjoyed by legitimate children. Because plaintiff's argument does not challenge any finding of fact made by the INS, the Court is entitled to subject the INS's determination of this question to a full review.

Several courts of this Circuit have had occasion to consider this question, albeit only in dictum. In *Roman v. Watson*, No. 71 Civ. 4905(CHT) (S.D.N.Y. May 13, 1976), each plaintiff had sought a preferential immigration classification on behalf of an illegitimate child. The Department of State denied all the requests, on the ground that the children in question, while they had been acknowledged by their putative fathers, did not enjoy all the rights of legitimate children and thus had not been "legiti-

mated" within the meaning of Section 101(b)(1)(C). When plaintiffs sought a writ of mandamus in the district court, Judge Tenney dismissed plaintiffs' complaint on the ground that they had failed to show, as required by the second prong of the Section 101(b)(1)(C) test, that the children in question were in plaintiffs' legal custody when and if they were legitimated. Slip op. at 6. He then went on to comment that the INS's interpretation of the term "legitimated" in Section 101(b)(1)(C) "appear[ed to be] justified." *Id.* at 10. On the other hand, the principle that "legitimation" can occur only when an illegitimate child obtains filial rights that are coextensive with those of a legitimate child has been rejected, in dictum, by two courts of this Circuit. *Reyes v. INS, supra*, 478 F.Supp. at 65–66; *Delgado v. INS*, 473 F.Supp. 1343, 1348 (S.D.N.Y. 1979). These courts reasoned that the interpretation of Section 101(b)(1)(C) espoused by the INS is insufficiently responsive to the statutory policy that "fraudulent children" should not be issued immigration visas to justify the extent to which the rule undermines the statutory goal of reuniting bona fide families. *See Reyes v. INS, supra*, 478 F.Supp. at 66 (quoting *Delgado v. INS, supra*, 473 F.Supp. at 1348).

 Existing judicial precedent thus provides the Court with no clear direction for resolving the question before it. Under these circumstances, the Court believes that the best course is to treat this question as one of first impression, and hence to ascertain the meaning of "legitimated" as used in Section 101(b)(1)(C) by reference to the traditional guideposts to statutory interpretation, namely, the language and administrative interpretations of Section 101(b)(1)(C), the legislative history of Section 101(b)(1)(C), the prevailing interpretations of statutes closely related to Section 101(b)(1)(C), and the general purposes that underly the INA's provisions for the granting of preferential immigration classifications.[5] *See Cook v. Budget Rent-A-Car Corp.*, 502 F.Supp. 494, 496 (S.D.N.Y.1980).

---

5. The question whether an illegitimate child has been legitimated within the meaning of

Section 101(b)(1)(C) is, in the Court's view, ultimately a question of United States federal

## A. Language and Administrative Interpretations of Section 101(b)(1)(C)

It is axiomatic, of course, that the starting point for interpreting a statute is the language of the statute itself. *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Mohegan Tribe v. Connecticut*, 638 F.2d 612, 618 (2d Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981). A second fundamental canon of statutory construction is that words, unless otherwise defined, will be interpreted as taking their ordinary, contemporary, common meaning. *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). The ordinary meaning of the word at issue here, "legitimated," is easily ascertained. Given that a "legitimate" child is a child born in wedlock, it follows that an illegitimate child has been "legitimated" when it has been placed in the position of a child born in wedlock. *See* Webster's Third New International Dictionary of the English Language 1291 (unabridged ed. 1963) ("legitimate" means "born in wedlock" when used as an adjective, and means "to put (a bastard) in the position or state of a legitimate child" when used as a verb). Thus, if the Court were to give the word "legitimated" its plain meaning in interpreting Section 101(b)(1)(C), it would agree with the INS that an illegitimate child has been "legitimated" only if the law of the child's domicile has granted him or her all the rights that it grants a legitimate child.

The Supreme Court has recently cautioned that, while the starting point in every case involving construction of a statute is the language of the statute itself, ascertainment of the meaning apparent on the face of a statute should not end a court's inquiry. *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). In a given case, the circumstances of the enactment of the statute may persuade a court that Congress did not intend that a particular word or phrase be given its ordinary meaning. *See, e. g., United States v. Ryan,* 284 U.S. 167, 175, 52 S.Ct. 65, 68, 76 L.Ed. 224 (1931). Accordingly, consideration of the other guideposts to statutory interpretation is necessary for the Court to resolve the question at hand, notwithstanding the fact that the ordinary meaning of the word "legitimated" impels the Court in the first instance toward a particular result.

A second axiom of statutory interpretation is that a construction of a statute made by a department charged with administration of the statute is entitled to substantial deference. *United States v. Rutherford,* 442 U.S. 544, 553–54, 99 S.Ct. 2470, 2476–77, 61 L.Ed.2d 68 (1979); *North Haven Board of Education v. Hufstedler,* 629 F.2d 773, 777 (2d Cir. 1980), *cert. granted,* 450 U.S. 909, 101 S.Ct. 1345, 67 L.Ed.2d 332 (1981). The courts have consistently shown such deference to interpretations of the INA made by either the Department of Justice (of which the INS and the Board of Immigration Appeals are separate parts) or the Department of State,

law. The statute operates as follows. First, a court seeking to apply the statute looks to the law of the child's and the father's domiciles and determines what filial rights the illegitimate child has under these bodies of law. The reference here will be either to foreign law or to United States state law. Then, the court analyzes whether the rights enjoyed by the illegitimate child add up to the rights of a "legitimated" child, giving the term "legitimated" a meaning as a matter of United States federal law. Since, for the reasons discussed at length *infra*, a "legitimated" child within the meaning of the United States immigration laws is a child having all the rights that legitimate children have under the law of either the child's or the

father's domicile, the second stage of a court's inquiry under Section 101(b)(1)(C) requires it to refer again to the law of the child's and the father's domiciles to determine what filial rights are enjoyed by legitimate children under these bodies of law. If, upon comparing the rights of the particular illegitimate child before it with those generally enjoyed by legitimate children, it determines that the illegitimate child's rights are at least equal to those of a legitimate child, the court should find that the child has been "legitimated" as a matter of United States federal law. Otherwise, the Court should hold that the child does not fit the definition set forth in Section 101(b)(1)(C).

the agencies statutorily entrusted with the administration of the INA. 8 U.S.C. §§ 1103–04; *see, e.g., Oloteo v. INS,* 643 F.2d 679, 683 (9th Cir. 1981) (deference to Department of Justice); *De Avilia v. Civiletti,* 643 F.2d 471, 475 (7th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 314, 70 L. Ed.2d 157 (1981) (deference to Department of State); *Nazerano v. Attorney General of the United States, supra,* 512 F.2d at 940 (deference to the INS); *Delgado v. INS, supra,* 473 F.Supp. at 1348 (deference to the INS).[6] The deference given to such an administrative interpretation is heightened when the construction in question has remained consistent over a long period of time. *EEOC v. Associated Dry Goods Corp.,* 449 U.S. 560, 600 n.17, 101 S.Ct. 817, 823 n.17, 66 L.Ed.2d 762 (1981). Under the Board of Immigration Appeals' interpretation of Section 101(b)(1)(C), followed here by the INS, an illegitimate child has been "legitimated" only if the law of his or her domicile has

**6.** The deference that a reviewing court gives to these agencies' legal interpretations of the INA is, of course, different from the conclusive effect that is given to factual determinations made by the INS in the context of administrative hearings. As noted, the courts subject administrative agencies' conclusions of law to plenary review, meaning that, while the judiciary will have regard for an agency's legal analysis, that analysis is in no way binding on a reviewing court.

**7.** The "exception" involved *In re Lee,* 16 I. & N. Dec. 305 (1977). There, the Board of Immigration Appeals had to decide whether "recognition" under Korean law constituted "legitimation" within the meaning of Section 101(b)(1)(C). Korean law gives a legitimate child priority over a recognized child in succeeding to the role of "Head of the Family." A child succeeding to that role has greater inheritance rights than his or her siblings. The Board of Immigration Appeals purported to apply its traditional definition of "legitimated" to this case, noting that "[i]f [the] Korean legal procedure [of recognition] brings into effect rights and duties coextensive with the rights and duties of children born during wedlock under the laws of Korea, then [this procedure] deserves inclusion under the legally descriptive term of art 'legitimation.'" *Id.* at 306. Concluding that "recognition" did have this effect under Korean law, the Board of Immigration Appeals held that a "recognized" child under Korean law was a "legitimated" child for the purposes of United States immigration law. *Id.* at 307. The decision stated that the difference

operated to give the child all the filial rights of a legitimate child. *In re Reyes, supra* note 4, 16 I. & N. Dec. at 479. The Board first enunciated this rule nearly a quarter century ago. *See In re D.,* 7 I. & N. Dec. 438, 440 (1957) (illegitimate child has been "legitimated" for the purposes of Section 101(b)(1)(C) only if that child has "the attributes of a legitimate child in all respects"). With one arguable exception, the Board has consistently followed this interpretation since its enunciation.[7] Under these circumstances, the Court is bound to hold that the Board's interpretation of the word "legitimated," which is consistent with the plain meaning of that term, must be given substantial deference.

Concededly, the ordinary meaning of the word "legitimated" and the Board's interpretation consistent with that meaning are not inevitably controlling of the question

in inheritance rights that flows from a legitimate child's priority in becoming "Head of the Family" was immaterial, because "the concept of 'Head of Family' is entirely foreign to United States common law, and has no parallel in United States parent-child relations." *Id.*

Two courts of this Circuit have commented that the result in *Lee* is inconsistent with the rule that an illegitimate child has been "legitimated" only if he or she has all the rights of a legitimate child. *See Reyes v. INS, supra,* 478 F.Supp. at 65–66; *Delgado v. INS,* 473 F.Supp. at 1348 n.7. This Court agrees with the views expressed in *Reyes* and *Delgado.* Conceding that the concept of "Head of the Family" is unknown in United States law, the fact remains that, under Korean law, an illegitimate, albeit recognized, child does not have all the filial rights of a legitimate child. The Board of Immigration Appeals, upon being made aware of the inconsistency in its reasoning, also agreed, and promptly overruled *Lee* to the extent *Lee's* analysis could not be reconciled with previous decisions. *In re Reyes,* Int.Dec. No. 2822, slip op. at 7–8 (B.I.A.1980). This Court, noting that *Lee* was at least facially based on the traditional rule, and that the Board of Immigration Appeals promptly withdrew from *Lee* when apprised of *Lee's* inconsistency with previous decisions, cannot regard *Lee* as a significant break in the consistent line of INS decisions holding that a child has been "legitimated" within the meaning of Section 101(b)(1)(C) only if he or she has filial rights coextensive with those of a legitimate child.

before the Court. The Court must also consider the legislative history of Section 101(b)(1)(C), and the general purposes behind the statutory scheme of which it is a part, in order to decide the meaning that Congress intended the word to have when it enacted Section 101(b)(1)(C). Reference to statutes that are closely related to Section 101(b)(1)(C) is also appropriate. But it cannot be gainsaid that plaintiff faces a heavy burden indeed in attempting to overcome the plain meaning of the statutory language and the fact that Board's interpretation of that language is wholly consistent with its plain meaning. It is from the perspective of the large burden that confronts plaintiff that the Court proceeds to consider the additional guideposts to statutory interpretation.

### B. Legislative History

The legislative history of Section 101(b)(1)(C), in order to be properly understood, must be interpreted in the context of the structure of the INA as a whole and the course of development of United States immigration law during the twentieth century. Under the INA, an eligible immigrant can only qualify for the first or the second of the INA's six immigration preferences by demonstrating that he or she is a "child," within the meaning of 8 U.S.C. § 1101(b)(1), of either a citizen of the United States or an alien lawfully admitted for permanent residence in the United States. 8 U.S.C. § 1153(a)(1), (2). In other words, the need to define the term "child" for the purposes of United States immigration law exists because of the congressional decisions (1) to limit immigration into the United States by means of a quota system, and (2) to allocate the limited number of immigration visas by means of a system of preferences.

The Immigration Act of 1917, Pub.L. No. 64–301, 39 Stat. 874 (1917), the basic United States immigration act prior to the enactment of the INA, contained no quota system, and thus included no preference provisions and no definition of the term "child." The quota system made its first appearance in United States immigration law with the passage of the Quota Law of 1921. This law limited the number of any nationality entering the United States to three percent of the foreign-born persons of that nationality who lived in the United States in 1910. Quota Law of 1921, Pub.L. No. 67–5, § 2(a), 42 Stat. 5 (1921). The law further provided that "children" of citizens of the United States were not subject to the quota system, id. § 2(a)(8), and that "children" of aliens in the United States who had applied for United States citizenship were to be given preference in applying the quota system. Id. § 2(d)(2). These provisions created, for the first time, a need to define the term "child" for the purposes of United States immigration law. This need continued when the Quota Law of 1921 was replaced by the Immigration Act of 1924. The 1924 law, which remained in effect until enactment of the INA, altered the applicable quotas somewhat, but continued to exclude children of resident United States citizens from application of the quota system, and provided an immigration preference for children of non-resident United States citizens and resident aliens. Immigration Act of 1924, Pub.L. No. 68–139, §§ 4(a), 6(a)(1), (2), 11, 43 Stat. 153 (1924).

While the Quota Law of 1921 created a need to determine whether particular applicants for immigration visas were "children" of either citizens of the United States or aliens lawfully admitted for permanent residence in the United States, that statute contained no definition of the term "child." The Immigration Act of 1924 defined "child" only by providing that "[t]he terms 'child,' 'father,' and 'mother,' do not include a child or parent by adoption unless the adoption took place before January 1, 1924." Id. § 28(m). The 1924 statute was silent, however, on the status of illegitimate children under the immigration laws. Indeed, the United States immigration laws did not contain any reference to illegitimate children until the enactment of the INA in 1952, when Congress introduced the concept of "legitimated" children into United States immigration law by passing Section

101(b)(1)(C). During the thirty years between the Quota Law of 1921 and the enactment of the INA, it was left entirely to the courts and the relevant administrative agencies to determine when, if ever, an illegitimate child could be a "child" for the purposes of the United States immigration laws.

While the Court is aware of no judicial decision in these thirty years that passed on this question, its research has revealed an interpretation issued by the Department of State that dealt with the issue.[8] Originally, the regulations issued by the Department of State failed to provide any definition of the term "child" as used in the United States immigration laws. *See* Exec. Order No. 7865, Apr. 12, 1938, 3 C.F.R. 392 (1936–38 Comp.), *codified in* 22 C.F.R. pt. 61 (1939) (superseding Exec. Order No. 6986, Mar. 9, 1935). However, in 1946, the Department of State issued an entirely new set of regulations. *See* 11 Fed.Reg. 8904 (1946). These regulations contained the following provision with respect to illegitimate children:

> A petition for nonquota status for an illegitimate child who is an alien may be filed with the Department of Justice when the petition is executed by the mother, if she is a citizen of the United States, or by the father, if he has subsequently married the mother of the illegitimate child and thereby conferred on the child the rights of legitimacy or has legitimated the child under the law of his domicil [sic], and if he is an American citizen.

11 Fed.Reg. 8919 (1946), *codified in* 22 C.F.R. § 42.209 (1949). Thus, the Department of State's regulations, while they excluded adopted children and stepchildren from the statutory definition of "child," *see* 11 Fed.Reg. 8906 (1946), *codified in* 22 C.F.R. § 42.101(5) (1949), included "legitimated" children within that term. More importantly, the Department of State plainly understood that a "legitimated" child was an illegitimate child on whom all the rights of legitimacy had subsequently been conferred.

It was in this context that Congress decided to enact Section 101(b)(1)(C) as part of the INA, providing therein that "legitimated" children would be deemed children for the purposes of applying the preference system set forth in the INA. The congressional reports that accompanied the bills that ultimately became the INA contain no explanation for the congressional determination to enact Section 101(b)(1)(C). *See* H.R.Rep. No. 1365, 82d Cong., 2d Sess. (1952), *reprinted in* [1952] U.S.Code Cong. & Ad.News 1653; S.Rep. No. 1137, 82d Cong., 2d Sess. (1952); H.R.Conf.Rep. No. 2096, 82d Cong., 2d Sess. (1952). The Court has not located any reference to Section 101(b)(1)(C) or the general question of the status of illegitimate children under the United States immigration laws anywhere in the voluminous hearings that were held on the proposed legislation that ultimately became the INA. *See Revision of Immigration, Naturalization, and Nationality Laws:*

---

**8.** During this period, the three administrative agencies authorized to issue regulations under the United States immigration laws were the Department of Labor (of which the INS was a part until 1941); the Department of Justice (to which the INS was transferred in 1941); and the Department of State. *See* Immigration Act of 1917, *supra*, § 23, and Immigration Act of 1924, *supra*, § 24 (authorizing Commissioner General of Immigration, under direction of Secretary of Labor, to issue rules and regulations calculated to carry out provisions of these acts); Reorganization Plan No. V, 54 Stat. 1238 (1940) (transferring INS and its functions from Department of Labor to Department of Justice); Immigration Act of 1924, *supra*, § 24 (authorizing Secretary of State to prescribe rules and regulations calculated to carry out

those provisions of the act to be administered by consular officers). The Department of Labor, while it did issue extensive regulations under the then prevailing immigration laws, did not therein define the term child. *See* Immigration and Naturalization Service, Immigration Rules and Regulations of Jan. 1, 1930 (1936), *codified in* 8 C.F.R. pts. 1–36 (1939). The Department of Justice, upon taking over the INS, never defined the term "child" beyond restating the statutory language that " '[c]hild,' 'father,' and 'mother' do not, when used in reference to the documentary requirements and classification of immigrants under the [Immigration Act of 1924], include a child or parent by adoption on or after January 21, 1924, or a stepchild, or a stepparent." 12 Fed.Reg. 5142 (1947), *codified in* 8 C.F.R. § 176.101(s) (1949).

*Joint Hearings on S. 716, H.R. 2379, and H.R. 2816 Before the Subcomms. of the Comms. on the Judiciary*, 82d Cong., 1st Sess. (1951). Nor has the Court found any discussion of Section 101(b)(1)(C) or the subject with which it deals in the lengthy congressional debates that preceded passage of the INA.

Fortunately, however, there is an earlier congressional report that sheds substantial light on the congressional decision that certain illegitimate children should be deemed "children" for the purposes of the United States immigration laws. In 1947, the United States Senate directed the Senate Committee on the Judiciary to conduct an investigation of and submit recommendations concerning the immigration and nationality laws of the United States. *See* S.Rep. No. 137, 80th Cong., 1st Sess. (1947). The committee's report, containing the requested investigation and recommendations, was submitted in 1950. *See* S.Rep. No. 1515, 81st Cong., 2d Sess. (1950). Many of the report's recommendations were carried over into the legislation that was ultimately enacted as the INA. *See* 98 Cong.Rec. 5088–89 (1952) (remarks of Sen. McCarran, Chairman, Committee on the Judiciary). The report noted the Department of State regulations discussed above, and commented that they provided that "[a] petition may be filed for nonquota status for an alien illegitimate child ... by the citizen father if he has subsequently married the mother and *thereby conferred rights of legitimacy under the law of his domicile.*" S.Rep. No. 1515, *supra*, at 462 (emphasis added). The report then proceeded to recommend that the statutory term "child" should include illegitimate children "if legitimated under the law of either the child's or the father's residence or domicile [and] if the legitimation takes place before the child reaches the age of 16 and while in the legal custody of the legitimating parent." *Id.* at 468. It is apparent to the Court that the report was basically recommending statutory codification of the Department of State's rule that "legitimated" children were "children" within the meaning of the immigration laws. There

can be no doubt that the committee's understanding was that "legitimation" occurred only when an illegitimate child received all the benefits of legitimacy; elsewhere in its report, the committee explained the term in precisely this fashion. *See id.* at 693 (defining "legitimation" under United States *nationality* law as the process by which an illegitimate child "gains the full rights of a legitimate child"). Thus, the committee not only recommended statutory codification of the Department of State's rule, but also implicitly endorsed the Department of State's view that a "legitimated" child is · one who enjoys the "rights of legitimacy."

On the basis of the foregoing, the Court has drawn the following conclusions regarding the legislative history of Section 101(b)(1)(C). The need to determine the status of illegitimate children under the United States immigration laws arose in 1921 when Congress decided to limit immigration into the United States by means of a quota system and further determined to allocate the limited number of immigration visas by means of a system of preferences that gave priority to "children" of certain persons. However, the United States immigration laws did not contain any provision regarding the status of *illegitimate* children until 1952, when Congress enacted Section 101(b)(1)(C) as part of the INA. The decision to include Section 101(b)(1)(C) in the INA was based on a recommendation by the Senate Committee on the Judiciary, made two years earlier, that illegitimate children should be eligible for preferential immigration classification if they had been "legitimated." The committee's recommendation was designed as a statutory codification of a Department of State regulation that deemed "legitimated" children to be children within the meaning of the then-existing immigration laws. The Department of State regulation defined a "legitimated" child as an illegitimate child who had received all the benefits of legitimacy. The Senate Committee on the Judiciary understood "legitimated" to have this meaning when it recommended statutory codification of the Department of State regulation, and

Congress endorsed this interpretation of the term when it accepted the committee's recommendation. In short, the legislative history of the term "legitimated" as used in Section 101(b)(1)(C), like the plain meaning and the prevailing administrative interpretation of the word, indicates that a "legitimated" child under that section is an illegitimate child who enjoys all the filial rights of a legitimate child.

### C. Related Statutes

■ Courts have often recognized that the resolution of questions of statutory interpretation may be aided by reference to the prevailing interpretation of other statutes that share the same language and either have the same general purpose or deal with the same general subject as the statute under consideration. *Northcross v. Board of Education of the Memphis City Schools,* 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973) (per curiam); *Cook v. Budget Rent-A-Car Corp., supra,* 502 F.Supp. at 500. The United States immigration laws are closely related to the United States nationality laws, which are the laws that govern the acquisition of United States citizenship. Indeed, while the laws governing immigration were for years enacted in separate legislation from those governing nationality, United States immigration law and United States nationality law were merged into a single statutory scheme in 1952, by passage of the INA. Illegitimate children have long created problems in the administration of the United States nationality laws, because of the traditional rule that children of United States citizens acquire United States citizenship at birth, and doubts as to when, if ever, illegitimate children could be deemed children for the purposes of applying this rule. Today, the United States nationality laws, as codified in the INA, expressly define the term "child" to include an illegitimate child who has been "legitimated" and who has satisfied certain other criteria. 8 U.S.C. § 1101(c)(1). Similarly, the INA makes the provisions governing the derivative citizenship of children of United States citizens applicable to illegitimate children

whose paternity has been established by "legitimation." 8 U.S.C. § 1409. As will be seen, the Court's determination of the meaning of the terms "legitimated" and "legitimation" as used in United States immigration law is significantly informed by the advent and prevailing interpretation of these terms in United States nationality law.

The first provisions in the United States nationality laws that dealt with illegitimate children were enacted as part of the Nationality Act of 1940, Pub.L. No. 76–853, 54 Stat. 1137 (1940). These provisions were substantially re-enacted as part of the INA, and remain in force today. Prior to the passage of the Nationality Act of 1940, the citizenship of foreign-born children of United States citizens was governed by section 1993 of the Revised Statutes of the United States (1878) ("Section 1993"), as amended by the Act of May 24, 1934, Pub.L. No. 73–250, § 1, 48 Stat. 797 (1934). Section 1993, as amended, read as follows in relevant part:

> Any child hereafter born out of the limits and jurisdiction of the United States whose father or mother or both at the time of the birth of such child is a citizen of the United States, is declared to be a citizen of the United States; but the rights of citizenship shall not descend to any such child unless the citizen father or citizen mother, as the case may be, has resided in the United States previous to the birth of such child.

*See* 8 U.S.C. § 6 (1934).

It was left to the courts and to the executive departments that administered the nationality laws to determine when, if ever, illegitimate children qualified for derivative citizenship under Section 1993. Interestingly, a disagreement developed between the executive branch and the judiciary on this issue. The Department of State consistently took the position that an illegitimate child could qualify for derivative citizenship under Section 1993 if he or she had been "legitimated" by the laws of his or her father's domicile. *To Revise and Codify the Nationality Laws of the United States into*

a Comprehensive Nationality Code: Hearings on H.R. 6127 Before the Comm. on Immigration and Naturalization, 76th Cong., 1st Sess. 431 (1940) (hereinafter "1940 Hearings") (report on the revision and codification of the nationality laws submitted jointly by Secretary of State, Attorney General, and Secretary of Labor). The Department of Justice subsequently endorsed this view. 32 Op. Att'y Gen'l 162, 164 (1920). The courts consistently declined to follow this interpretation, holding that the term "child" in Section 1993 referred only to legitimate children, and not to illegitimate children who were subsequently "legitimated." See, e. g., Mason ex rel. Chin Suey v. Tillinghast, 26 F.2d 588, 589 (1st Cir. 1928); Ng Suey Hi v. Weedin, 21 F.2d 801, 802 (9th Cir. 1927). Undaunted, the Department of Justice continued to assert the validity of the Department of State's interpretation, see 39 Op. Att'y Gen'l 556, 558–59 (1937), while at the same time urging that Congress pass legislation to resolve the issue. 39 Op. Att'y Gen'l 290, 291 (1939).

The Nationality Act of 1940 effected such a resolution; Congress determined that a foreign-born, illegitimate child of United States citizens should be eligible for United States citizenship if the child had been "legitimated" under the law of his or her domicile and if the "legitimation" occurred when the child was in the legal custody of the legitimating parent. Nationality Act of 1940, supra, §§ 102(h), 205. Examination of the legislative history of the Nationality Act of 1940 leaves little doubt concerning what Congress meant to require by the terms "legitimated" and "legitimation." Concededly, the congressional reports that accompanied the legislation that became the Nationality Act of 1940 shed no light on the issue. See S.Rep. No. 2150, 76th Cong., 3d Sess. 5 (1940); H.R.Rep. No. 2396, 76th Cong., 3d Sess. 2, 4–9 (1940). However,

testimony during the hearings on the proposed legislation demonstrates that Congress understood a "legitimated" child to be a child who the law treated "just as if it had been born legitimately." 1940 Hearings, supra, at 62 (remarks of R. W. Flournoy, Assistant Legal Adviser, Department of State). Further evidence that Congress understood "legitimated" to have this meaning is supplied by the proposal of the National Council on Naturalization and Citizenship that illegitimate children who had been "acknowledged" by their fathers, but who legally did not enjoy all the rights of a legitimate child, be made eligible for derivative citizenship. See id. at 392–94. Congress failed to adopt this proposal, and the Nationality Act of 1940 thus made only illegitimate children who had been "legitimated" eligible for derivative citizenship. This indicates not only that Congress did not wish to make illegitimate children eligible for derivative citizenship unless they had received the full rights of a legitimate child, but. also that Congress believed this result would be accomplished by limiting eligibility to "legitimated" children.

On the basis of the foregoing, then, the Court concludes that an illegitimate child has been "legitimated" within the meaning of the Nationality Act of 1940 only if all the benefits of legitimacy have been conferred on him or her. Accord, Peignand v. INS, 440 F.2d 757, 759–60 (1st Cir. 1971). Thus, in 1952, when Congress passed the INA and first used the term "legitimated" in the United States immigration laws, the prevailing interpretation of that term under the United States nationality laws was that a "legitimated" child was one possessing all the filial rights of a legitimate child.[9] In other words, reference to the body of law most closely related to United States immigration law supports a reading of the word

---

**9.** As discussed in text supra, the provisions in the Nationality Act of 1940 that dealt with illegitimate children were substantially carried over into subchapter III of the INA, the portion of the statute that governs nationality and citizenship. The Court notes that the prevailing interpretation of the term "legitimated" as used

in 8 U.S.C. § 1101(c)(1), the provision that defines "child" for the purposes of subchapter III of the INA, is identical with the prevailing interpretation of that term as used in the Nationality Act of 1940. See, e. g., In re Fraga, 429 F.Supp. 549, 552 (D.P.R.1976).

"legitimated" in Section 101(b)(1)(C) that is entirely consistent with the word's plain meaning and the administrative interpretation and legislative history of the term.[10]

10. While the Court attaches significant weight to the prevailing interpretation of the word "legitimated" as used in 8 U.S.C. § 1101(c)(1), it is unable to give similar importance to the prevailing interpretations of two other statutes that might arguably be deemed "related" to Section 101(b)(1)(C). Many United States state inheritance statutes employ the term "legitimated" in defining the inheritance rights of illegitimate children from their natural parents. These statutes consistently use the term "legitimated" to refer to an illegitimate child who has received all the filial rights of a legitimate child. See, e. g., N.J.Stat.Ann. § 9:15–1 (West); Tex. Civ.Code Ann. tit. 17A, § 42(b) (Vernon). However, since these statutes were written to deal with a problem having little or nothing to do with the concerns addressed by Section 101(b)(1)(C), the Court believes that it would be unwise to interpret the word "legitimated" as used in Section 101(b)(1)(C) by reference to the prevailing interpretation of the word "legitimated" as used in these state statutes.

The second statute that is arguably "related" to Section 101(b)(1)(C) is section 101(b)(1)(E) of the INA, 8 U.S.C. § 1101(b)(1)(E) ("Section 101(b)(1)(E)"). This section, added to the INA in 1957, expands the statutory definition of the term "child" to include a person "adopted while under the age of fourteen years if the child has thereafter been in the legal custody of, and has resided with, the adopting parent or parents for at least two years." 8 U.S.C. § 1101(b)(1)(E). In similar fashion to the method by which one determines whether a child has been "legitimated" within the meaning of Section 101(b)(1)(C), the question whether a given person has been "adopted" under Section 101(b)(1)(E) is resolved by reference to the person's legal status under the law of the country where the purported adoption occurred. An adoption, to be valid for the purposes of Section 101(b)(1)(E), must confer legal rights on the person adopted that he or she previously did not have. In re Palelei, 16 I. & N. Dec. 716, 717 (1979). While there is a good deal of confusion concerning the precise extent of the legal rights that a particular individual must have received to have been "adopted" within the meaning of Section 101(b)(1)(E), it has consistently been held that the "adoption" need not have conferred the full rights of a legitimate child on the person in question. In re Benjamin, 15 I. & N. Dec. 709, 711 (1976) (person has been "adopted" under Section 101(b)(1)(E) merely if he or she has received legal rights with respect to his or her adoptive parents that are "analogous" to those that a legitimate child has with respect to his or her natural parents); In re Kong, 15 I. & N. Dec. 224, 224–26 (1975) (person has been "adopted" under Section 101(b)(1)(E), in spite of the fact that he or she has not received the full rights of a legitimate child in all respects, as long as he or she has received full inheritance rights as a result of the adoption); In re Ng, 14 I. & N. Dec. 135, 137 (1972) (person held to have been "adopted" under Section 101(b)(1)(E) even though she concededly had not received full inheritance rights of a legitimate child as a result of the adoption). See also Mila v. District Director, 494 F.Supp. 998, 1000 (D.Utah 1980) (holding that plaintiff had been "adopted" under Section 101(b)(1)(E) even though he did not receive any inheritance rights as a result of the adoption).

The Court, while it will accept for present purposes the proposition that a person need not receive the full rights of a legitimate child to be "adopted" under Section 101(b)(1)(E), is unwilling to conclude from this that Congress did not intend to require that an illegitimate child receive the full rights of a legitimate child to be "legitimated" under Section 101(b)(1)(C). This unwillingness is based on the differences between foreign laws on adoption and foreign laws on legitimation, and also on the differences between Section 101(b)(1)(C) and Section 101(b)(1)(E). While the Court is aware of no foreign country where an illegitimate child cannot, as a matter of law, be placed in the position of a legitimate child, it appears that the law of many foreign countries makes it legally impossible for a person to give an individual who is not his or her natural child the full rights of a legitimate child. 1 Gordon & Rosenfeld, supra note 2, § 2.18b, at 2–158. Given this, it is reasonable to conclude that Congress could not have intended to require full rights of legitimacy as a predicate to a Section 101(b)(1)(E) "adoption"; it does not follow, however, that Congress could not have intended to require full rights of legitimacy as a predicate to a Section 101(b)(1)(C) "legitimation." Turning to the language of Sections 101(b)(1)(C) and 101(b)(1)(E), the Court notes that Section 101(b)(1)(E) imposes different age and legal custody requirements than does Section 101(b)(1)(C). This indicates that Congress did not intend Section 101(b)(1)(E) to mirror Section 101(b)(1)(C), and inclines the Court against relying on the prevailing interpretation of the prerequisites to a Section 101(b)(1)(E) "adoption" as a means of ascertaining the necessary conditions to a Section 101(b)(1)(C) "legitimation."

The Court further observes that, even if the prevailing interpretation of Section 101(b)(1)(E) were entitled to weight comparable to that which the Court herein assigns to the prevailing interpretation of 8 U.S.C. § 1101(c)(1), the Court's ultimate interpretation of Section 101(b)(1)(C) would not be altered. Were the Court to give the prevailing interpretation of Section 101(b)(1)(E) such weight, the Court would have before it two statutes closely related to Section 101(b)(1)(C), each supportive

#### D. Purpose of the Statute

 It scarcely need be said that any court faced with a problem of statutory construction should endeavor to interpret the statute in question in light of the purposes that Congress sought to serve by its enactment. *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). Thus, the courts will not give a statute its plain meaning where to do so would lead to a result that conflicts with common sense and that is unreasonable in light of the evident statutory purpose. *In re Adamo*, 619 F.2d 216, 222 (2d Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980). On the other hand, where the plain wording of the statute and the other guideposts to statutory construction support an interpretation that is reasonably calculated to achieve the statutory purpose, it is not for the judiciary to substitute its judgment for that of Congress by giving the statute a different interpretation, even if the court is convinced that its approach is better calculated to achieve the goals that Congress had in mind. *Chiaramonte v. INS*, 626 F.2d 1093, 1100 (2d Cir. 1980); *Manufacturers Hanover Trust Co. v. Commissioner*, 431 F.2d 664, 668 (2d Cir. 1970); *United Parcel Service, Inc. v. United States Postal Service*, 455 F.Supp. 857, 866 (E.D.Pa.1978), *aff'd*, 604 F.2d 1370 (3d Cir. 1979), *cert. denied*, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 815 (1980).

Section 101(b)(1)(C), the provision at issue here, is part of a statutory definition that is used to determine eligibility for no fewer than four of the first five preferential immigration classifications set forth in the INA. *See* 8 U.S.C. § 1153(a)(1), (2), (4), (5) (availability of each preferential immigra-tion classification hinging on whether applicant is a "child" within the meaning of the INA). As a result, the particular goal that led Congress to structure the INA's preference system as it did presumably also informed the congressional decision to enact Section 101(b)(1)(C). It has repeatedly been stated that the preference system codified in the United States immigration laws is rooted in a congressional recognition of the desirability of maintaining or fostering the unity of immigrant families. *See, e. g.*, S.Rep. No. 1515, *supra*, at 435. The parties before the Court do not contest this proposition. The question to be decided by the Court is thus simply whether Section 101(b)(1)(C), if interpreted in accord with its plain meaning, is reasonably calculated to serve this purpose. In other words, the Court must determine whether the unity of immigrant families is reasonably likely to be maintained or fostered by requiring an illegitimate child to have the full filial rights of a legitimate child before being eligible for a preferential immigration classification.

It is no answer to this question to observe that interpreting "legitimated" in accord with its plain meaning inevitably prevents unification of some immigrant families.[11] It must be remembered that the quota system set forth in the INA limits the number of immigrants who may be admitted in any given year on the basis of a particular preference. Thus, the statutory purpose of reuniting immigrant families is served not only by assisting the unification of bona fide families, but also by preventing "fraudulent" families from taking advantage of the preference system. Each time that a fraudulent preferential immigration classification is avoided, an additional place is opened

---

of a different interpretation of that section. Under these circumstances, the Court would be forced to conclude that analysis of "related statutes" offers no guidance to the proper interpretation of Section 101(b)(1)(C). This conclusion would not alter, however, the Court's independent analysis of the plain meaning, the administrative interpretation, and the legislative history of the word "legitimated" as used in Section 101(b)(1)(C), meaning that the Court would, in accord with the reading supported by each of these three guideposts to statutory interpretation, still hold that an illegitimate child must have received the full rights of a legitimate child to have been "legitimated" within the meaning of Section 101(b)(1)(C).

11. This result would occur, for example, where marriage of the parents is a legal prerequisite to the child obtaining the full rights of legitimacy, yet such a marriage is, as a practical matter, impossible.

up through which a bona fide immigrant family can be reunited. Accordingly, the question whether the INS's interpretation of the word "legitimated" is reasonably calculated to serve the statutory purpose underlying Section 101(b)(1)(C) should be analyzed by focusing on whether requiring an applicant illegitimate child to have all the rights of a legitimate child is reasonably calculated to avoid issuing immigrant visas to "fraudulent" children. *Accord, Delgado v INS, supra,* 473 F.Supp. at 1348.

Judge Sofaer of this Court has stated that the INS's interpretation of Section 101(b)(1)(C) "has no reasonable relation to preventing fraud," at least insofar as it requires an illegitimate child to have the same inheritance rights as a legitimate child in order to be eligible for a preferential immigration classification. *Id.* Pointing out that a child may always be denied an inheritance if he or she is simply "cut off" in the parent's will, Judge Sofaer dismissed the possibility that a significant number of frauds are deterred because people are unwilling to give a fraudulent child the same intestate rights as enjoyed by a legitimate child. *Id.* at 1348 & n.6.

While another court of this Circuit has endorsed Judge Sofaer's analysis, *see Reyes v. INS, supra,* 478 F.Supp. at 66, this Court declines to do so. The Court takes no exception to Judge Sofaer's conclusion that fraud is extremely unlikely to be deterred by the mere fact that the "full rights of legitimacy" include the inheritance rights of a legitimate child. However, it is the Court's view that the deterrent effect of requiring an illegitimate child to show that it has filial rights coextensive with those of a legitimate child can only be appreciated by taking a broad view of the scope of such rights and also by considering how such rights are conferred on an illegitimate child. Viewed as a whole, the rights of a legitimate child, involving as they do rights to support and to use the family name as well as inheritance rights, are significant enough that Congress certainly could reasonably have concluded that fraud would be deterred if a child had to be given all these rights to be made eligible for a preferential

immigration classification. Moreover, the Court notes that in many countries an illegitimate child can only receive the full rights of a legitimate child if the parents of the illegitimate child subsequently marry. As a practical matter, then, the requirement that an illegitimate child have the full rights of legitimacy to be eligible for a preferential immigration classification is, in a great number of cases, really a requirement that the parents of the child marry. Such a requirement is reasonably calculated to deter fraud: the willingness of a person to commit fraud in order to gain preferential immigration status for a child is certainly likely to be lessened if the fraud can only be accomplished by marrying the child's mother.

The Court tends to agree with Judge Sofaer that a rule requiring something less than full rights of legitimacy as a predicate to receiving a preferential immigration classification would effectively deter fraud and at the same time would permit unification of bona fide immigrant families where, as a practical matter, the illegitimate child cannot be given the full rights of legitimacy. In other words, the Court accepts plaintiff's vigorous argument that the statutory purposes underlying Section 101(b)(1)(C) are less well served by interpreting "child" to include only illegitimate children who demonstrate that they have *all* the filial rights of a legitimate child than they would be were a less onerous interpretation of the term "child" adopted. Unfortunately for plaintiff, the Court's inquiry in this context is not whether the statute, if interpreted in accordance with its plain meaning, gives effect to the purposes underlying the statute in the most efficacious manner possible, but merely whether the statute, so interpreted, is *reasonably calculated* to serve these purposes. The Court has no doubt, based on the analysis set forth above, that requiring demonstration of *full* rights of legitimacy as a predicate to being eligible for a preferential immigration classification is an approach reasonably calculated to deter fraud and thus to achieve the statutory purpose of reuniting bona fide immigrant families. Plaintiff's persuasive argument

that a better means of serving the goals of the INA is available should, in the final analysis, be addressed to Congress and not to this Court.

### E. Conclusion

Under both the language of Section 101(b)(1)(C) and the administrative interpretation of that language, Enmanuel de los Santos has not been "legitimated" within the meaning of that provision, and thus is not a "child" within the meaning of the United States immigration laws. Analysis of the legislative history of Section 101(b)(1)(C), and of the United States nationality laws, which are closely related to the United States immigration laws, supports this conclusion. Section 101(b)(1)(C), if given the interpretation supported by its plain meaning and the other guideposts to statutory construction, is reasonably calculated to achieve the purpose that Congress sought to serve by enacting that provision. Accordingly, the Court rejects plaintiff's statutory argument that Enmanuel de los Santos should be granted a preferential immigration classification, and proceeds to consider plaintiff's argument that Section 101(b)(1)(C), if interpreted as the Court herein construes it, is unconstitutional.

### Plaintiff's Constitutional Argument

Plaintiff's constitutional argument presents no difficulties of comparable stature to those posed by his statutory argument. He contends that the INA, by requiring an illegitimate child who seeks a preferential immigration classification through his or her father to have been "legitimated," but making any illegitimate child who seeks priority through his or her mother eligible for such a classification, violates the principle of equal protection.[12] This argument has been rejected, on identical facts to those presented here, by two different courts of this Circuit. *Reyes v. INS, supra*, 478 F.Supp. at 65; *Delgado v.*

INS, supra, 473 F.Supp. at 1347. This Court also rejects plaintiff's constitutional argument, substantially for the reasons expressed in *Reyes* and *Delgado. See Fiallo v. Bell*, 430 U.S. 787, 797–99, 97 S.Ct. 1473, 1480–81, 52 L.Ed.2d 50 (1977).

### CONCLUSION

Enmanuel de los Santos is not a "child" of plaintiff within the meaning of 8 U.S.C. § 1101(b)(1)(C), and thus cannot claim the preferential immigration classification set forth in 8 U.S.C. § 1153(a)(2). The definition of the term "child" set forth in 8 U.S.C. § 1101(b)(1) is not unconstitutional because of the distinction that it draws between fathers and mothers of illegitimate children. The INS thus was correct in denying plaintiff's petition that Enmanuel de los Santos be granted a preferential immigration classification. Accordingly, plaintiff's motion for summary judgment is denied, and defendant's cross-motion for summary judgment is granted. Summary judgment is hereby granted to defendant, and plaintiff's complaint is hereby dismissed.

It is so ordered.

---

**12.** By its terms the fourteenth amendment's equal protection clause applies only to state action that denies equal treatment. "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. But the Supreme Court has held that the due process clause of the fifth amendment yields a norm of equal protection virtually indistinguishable from that of the fourteenth amendment. *Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).